U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2012 MAY -7 PM 2: 10

CLERK
BY
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

ASCENT HEALTHCARE SOLUTIONS, INC., )
)
Plaintiff, )
)
v. ) Case No. 5:10-cv-277
)
ROBERT DUMONT, )
)
Defendant. )

**OPINION AND ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT
ON DEFENDANT'S COUNTERCLAIMS**
(Doc. 43)

Plaintiff Ascent Healthcare Solutions, Inc. ("Ascent"), a provider of reprocessing services for hospitals and surgery centers, brings this action against Defendant Robert Dumont, a former Ascent employee, alleging breach of contract, threatened and/or actual misappropriation of trade secrets, and conversion. Mr. Dumont counterclaims against Ascent, alleging wrongful termination under Vermont law, and age discrimination in violation of Vermont's Fair Employment Practices Act ("VFEPA"). Presently before the court is Ascent's motion seeking summary judgment on each of Mr. Dumont's counterclaims based upon a release. (Doc. 43.) The court heard oral argument on February 16, 2012.

Ascent is represented by C. Nicholas Burke, Esq., Jeffrey P. Swatzell, Esq., and Michael D. Wexler, Esq. Mr. Dumont is represented by Norman E. Watts, Jr., Esq.

## I. The Undisputed Facts.

Ascent is a leading provider of reprocessing services for hospitals and surgery centers across North America, specializing in the reprocessing and remanufacturing of "single use" medical devices. Mr. Dumont was employed by Ascent from June 2005 until April 23, 2010. From June 2005 until June 2008, he held the position of Client Service Technician. From June 2008 until his termination, Mr. Dumont served as a Senior Account Manager, covering the much of the northeastern United States, including all of New Hampshire and Vermont, as well as portions of New York and Massachusetts. As a Senior Account Manager, Mr. Dumont managed Ascent's relationship with approximately twenty customers throughout this territory. His responsibilities included traveling to customers' facilities to meet with them and collect products, visiting operating rooms to forge relationships with surgeon groups, educating customers with regard to Ascent's products and services, and facilitating customer purchasing. Mr. Dumont was also responsible for growing Ascent's business. In conjunction with his position, Mr. Dumont had access to Ascent's confidential and proprietary business information. In exchange for the promise of continued employment, Ascent required Mr. Dumont to execute a Confidential Information, Anti-Piracy, Non-Compete and Intellectual Property Agreement (the "Agreement"), which he signed on April 1, 2007.

In the spring of 2010, Mr. Dumont was instructed by his immediate supervisor to value the contents of medical waste containers. He emailed his supervisor with his concerns that this practice would violate state and federal Occupational Health and Safety Administration ("VOSHA" and "OSHA") regulations, as well as Ascent's strict sealed container and regulatory compliance policies. Thereafter, on April 23, 2010, Mr. Dumont was allegedly terminated "for complaining about and refusing to follow orders to open the contaminated [used medical supply] containers[.]" (Doc. 4 at 10.)

At the time of his termination for "insubordination," Mr. Dumont was informed that a human resources representative, Ana Williams, would contact him with further information. On or about April 28, 2010, Ms. Williams emailed Mr. Dumont and instructed him to sign the attached Confidential General Release and Agreement (the

2

"Release") in the presence of a notary, and to return it to Ascent so he could "get his money." Ascent did not verbally inform Mr. Dumont that he had a right to consult an attorney or otherwise recommend that he seek legal advice before signing the Release. Mr. Dumont signed the Release the next day and returned it to Ascent.

The Release is a two-page document of single-spaced text in twelve-point font. It states in relevant part that Mr. Dumont agrees to release Ascent:

> from any and all actions, causes of action, claims or demands for damages, costs, expenses, compensation, consequential damages, punitive damages, or any other thing whatsoever, up to the date of the signing of this Release, including any claims of discrimination under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, the Age Discrimination in Employment Act, the Older Worker Benefits Protections Act, and any other state or federal law or statute. This release shall include any acts or omissions by Ascent relating to my employment with Ascent, and any other claims, allegations or matters which could have been the subject of a claim or action in any federal, state, local agency or court.

(Doc. 11-2 at 2.) This language is located in the first paragraph on the first page of the Release. It is not in bold text, and the sentence containing the rights released contains approximately 160 words.

The Release contains a clause that allowed Mr. Dumont "**up to twenty-one (21) full days from the date**" of receipt of the Release to consider whether to sign it, with the option "**to voluntarily waive this 21-day period *if [he] so choose[s]* by executing this Release before the end of 21 days.**" (*Id.*) He was also given seven days to revoke the Release after signing it and instructions regarding the revocation process. The Release states it "**will not become effective or enforceable (and [Mr. Dumont] will not receive any payment) until the end of the seventh day following [his] signing**," and later states that it "**will become effective on the eighth (8th) day following its signature by ROB DUMONT[.]**" (*Id.* at 2-3.) This text is entirely in bold font and is located in the last paragraph on the bottom of the first page, continuing on to the top of the second page.

The Release twice advises Mr. Dumont to consult an attorney of his choice before signing the document and requires Mr. Dumont to acknowledge that: "I understand that I have, by this Release, been advised to consult with an attorney of my choice before

3

signing" (*id.* at 2), and that "I have been afforded the opportunity to consult with legal counsel of my choice prior to signing." (*Id.* at 3.) The last sentence of the Release states in bold and capitalized text that Mr. Dumont "**CAREFULLY READ THE FOREGOING RELEASE, [HAD] BEEN ADVISED OF ITS MEANING AND CONSEQUENCES, [UNDERSTOOD] THE CONTENTS THEREOF, AND [HE] SIGN[ED] THE SAME AS [HIS] OWN FREE ACT.**" (*Id.*) Ascent paid Mr. Dumont $7,000 in consideration for his execution of the Release, which he accepted and has not returned.

Mr. Dumont contends that he has not regularly encountered legal phrases appearing in the Release such as "acquit," "discharge," and "consequential damages" in his experience as an account manager. He does not claim, however, that he did not understand those terms.

Ascent's countersignature on the Release was not applied contemporaneously with Mr. Dumont's signature, and it was not notarized. Ascent did not deliver a countersigned copy of the Release to Mr. Dumont.

## II. The Disputed Facts.

Ascent disputes Mr. Dumont's contention that in the spring of 2010, Mr. Dumont's immediate supervisor ordered him to open medical waste containers and take an inventory of contaminated medical devices at health care facilities without the protection of a safe and secure environment. This factual dispute is immaterial to the resolution of the pending motion because even when viewed in the light most favorable to Mr. Dumont, it does not prevent summary judgment in Ascent's favor. *See Demery v. Extebank Deferred Comp. Plan (B)*, 216 F.3d 283, 286 (2d Cir. 2000) ("Although [the courts] consider the evidence in the light most favorable to the non-moving party, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment, and the mere existence of factual issues--where those issues are not material to the claims before the court--will not suffice to defeat a motion for summary judgment.") (internal citations, quotation marks, and brackets omitted).

4

## III. Conclusions of Law and Analysis.

In seeking summary judgment, Ascent argues that when Mr. Dumont executed the Release in exchange for $7,000, he relinquished any claim he had against Ascent for wrongful termination and age discrimination, which are clearly within the scope of the Release. Ascent further claims the Release is valid and enforceable because Mr. Dumont executed it knowingly and voluntarily.

Mr. Dumont contends the Release is invalid because it violates the Older Workers' Benefit Protection Act ("OWBPA")[1] and Vermont's public policy. He does not challenge Ascent's claim that the Release would otherwise extinguish his claims.

In this case, federal jurisdiction is based on diversity of citizenship. 28 U.S.C. § 1332. Accordingly, the court applies the substantive law of Vermont, the forum state. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005).

### A. Standard of Review.

On a motion for summary judgment, the court examines "the evidence in the light most favorable to, and draw[s] all inferences in favor of, the non-movant." *Sheppard v. Beerman*, 317 F.3d 351, 354 (2d Cir. 2003) (citation omitted). Summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that it is entitled to summary judgment. *Huminski v. Corsones*, 386 F.3d 116, 132 (2d Cir. 2004). Only when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party [is there] no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

---

[1] To the extent Mr. Dumont argues the Release is invalid under the Age Discrimination in Employment Act ("ADEA") and the OWBPA, the court need not consider those arguments because Mr. Dumont's counterclaims allege only a violation of Vermont public policy and the VFEPA. *See Branker v. Pfizer, Inc.*, 981 F. Supp. 862, 867 (S.D.N.Y. 1997) (stating "the provisions of the OWBPA apply only to the ADEA and not to state law claims.").

### B. Whether Mr. Dumont's Counterclaims are within the Scope of the Release.

Under Vermont law, a valid release is an enforceable contract. *Goodnow v. Pedersen*, 2007 WL 4268908, at *2 (D. Vt. Nov. 30, 2007) (citing *Economou v. Economou*, 399 A.2d 496 (Vt. 1979)). As a result, "[i]f the terms of the contract are plain and unambiguous, 'they will be given effect and enforced in accordance with their language.'" *See O'Brien Bros.' P'ship, LLP v. Plociennik*, 2007 VT 105, ¶ 9, 182 Vt. 409, 414, 940 A.2d 692, 695 (quoting *KPC Corp. v. Book Press, Inc.*, 636 A.2d 325, 328 (Vt. 1993)). Whether ambiguity exists and the interpretation of an unambiguous contract are questions of law, not fact. *See John A. Russell Corp. v. Bohlig*, 739 A.2d 1212, 1216 (Vt. 1999).

> In interpreting a release to determine whether a particular claim has been discharged, the primary rule of construction is that [the parties'] intention is to be determined by a consideration of what was within the contemplation of the parties when the release was executed, which in turn is to be resolved in the light of the surrounding facts and circumstances under which the parties acted.

*Economou*, 399 A.2d at 500 (citing 66 AM. JUR. 2D Release § 30).

In this case, the Release states that Mr. Dumont agrees to release Ascent from any claims based on any state law or statute, as well as claims based on Ascent's actions relating to his employment that could have been the subject of a claim or action in any federal or state court. Mr. Dumont's state law claims for wrongful termination and age discrimination clearly fall within the scope of the Release, and Mr. Dumont does not contend otherwise. The court thus concludes that there are no issues of material fact regarding the scope of the Release.

### C. Whether Mr. Dumont Knowingly and Voluntarily Executed the Release.

Mr. Dumont does not contend that he did not understand the Release, or claim that he did not receive consideration in exchange for his signing it. Rather, he argues that the Release is invalid and unenforceable because he did not execute it knowingly and voluntarily.

Courts in the Second Circuit employ a "totality of the circumstances test" to determine whether a release of Title VII claims meets the "knowing and voluntary" standard. *See Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 438 (2d Cir. 1998). As Mr. Dumont's counterclaims are based on violations of VFEPA, which is patterned on Title VII, Vermont courts look to federal decisions interpreting Title VII as persuasive authority for the proper interpretation of VFEPA. *See Lavalley v. E.B. & A.C. Whiting Co.*, 692 A.2d 367, 369 (Vt. 1997). The relevant factors for the court to consider when making this determination include:

> 1) the plaintiff's education and business experience, 2) the amount of time the plaintiff had possession of or access to the agreement before signing it, 3) the role of plaintiff in deciding the terms of the agreement, 4) the clarity of the agreement, 5) whether the plaintiff was represented by or consulted with an attorney, and 6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law.

*Livingston*, 141 F.3d at 438.

"[T]he validity of a release is a peculiarly fact-sensitive inquiry." *Id.* at 437-38. Nevertheless, where the operative facts are not disputed, the court may decide the issue as a question of law. *See Hardingham v. United Counseling Serv. of Bennington Cnty., Inc.*, 672 A.2d 480, 483 (Vt. 1995) (where an issue is "'generally a question for the jury,' the trial court may decide the question as a matter of law 'where the minds of reasonable persons cannot differ.'") (quoting *Rivard v. Roy*, 196 A.2d 497, 500 (Vt. 1963)).

As Mr. Dumont observes, the first sentence of the Release contains 160 words consisting largely of legalese. *See Dougherty v. Teva Pharm. USA*, 2008 WL 508011, at *5 (E.D. Pa. Feb. 20, 2008) (considering fact that release was written in "a very straightforward fashion," utilized "plain English," and did not contain "legalese or jargon"). He also accurately points out that he had no role in drafting the Release or otherwise selecting its terms.[2] *See Livingston*, 141 F.3d at 438 (instructing the court to

---

[2] Mr. Dumont also argues that the signature of Ascent's representative was not applied contemporaneously with Mr. Dumont's signature, was not notarized, and a copy of the Release with the countersignature was never delivered to him. However, neither the applicable law nor

7

consider, among several other factors, what role the party releasing claims had in deciding the terms of the agreement); *see also Garneau v. Curtis & Bedell, Inc.*, 610 A.2d 132, 134 (Vt. 1992) (ambiguity in insurance contract drafted by party in superior bargaining position must be construed against drafter); *Viles v. Vt. State Colls.*, 724 A.2d 448, 450-51 (Vt. 1998) (ambiguity in employee benefit plan drafted by party with superior bargaining power must be construed against drafter). Several other factors, however, overwhelmingly support a conclusion that the Release was knowingly and voluntarily executed and is valid as a matter of law.

First, Mr. Dumont had at least five years of business experience[3] at the time of his termination and was responsible for growing Ascent's business and facilitating customer purchasing in a territory comprised of much of the northeastern United States, including all of New Hampshire and Vermont, as well as portions of New York and Massachusetts. He thus appears to have possessed the business sophistication and expertise to fully appreciate the binding nature of the legal document he was signing. *See Dewey v. PTT Telecom Neth., U.S., Inc.*, 1996 WL 364531, at *3 (2d Cir. July 2, 1996) (finding a knowing and voluntary release where, "[b]ased on [plaintiff's] college education and over twenty years of business experience, she should have understood the consequences of signing the release."); *Bormann v. AT&T Commc'ns., Inc.*, 875 F.2d 399, 403 (2d Cir. 1989) (affirming grant of summary judgment in part because plaintiffs "were experienced executives familiar with reading and analyzing contracts").

Second, there is no evidence that Mr. Dumont failed to understand any of the legal terms in the Release, or that he was somehow prevented from understanding the overall purpose and effect of the Release. Indeed, he does not claim he failed to understand any

---

the Release requires any of these things independently or collectively as a condition precedent to a finding that the Release was knowingly and voluntarily executed by Mr. Dumont.

[3] Although there are no facts about his educational background, if Mr. Dumont "believed there were genuine issues of material fact [as to his educational experience] to be tried, so as to preclude summary judgment, it was incumbent on him to so inform the district court and to do so by proffer of admissible evidence[.]" *Ridinger v. Dow Jones & Co. Inc.*, 651 F.3d 309, 317 (2d Cir. 2011).

part of the Release. In such circumstances, the law presumes that he intended to be bound by his signature. *See Gregorie v. Alpine Meadows Ski Corp.*, 2009 WL 2425960, at *19 (E.D. Cal. Aug. 7, 2009).

Third, Mr. Dumont does not contend that the twenty-one days he was provided to review the Release or the seven days he had after signing to revoke it were insufficient, or that he was in any way forced to return the Release before these deadlines expired. *See Mullen v. N.J. Steel Corp.*, 733 F. Supp. 1534, 1544-45 (D. N.J. 1990) (finding that employee's signing of release was knowing and voluntary where he had fourteen days to consider the release); *Miller v. Tyco Elecs., Ltd.*, 2011 WL 5878338, at *4 (M.D. Pa. Nov. 23, 2011) (agreeing with employer that employee's "decision to sign the release agreement quickly upon receiving it does not mean that she did not have sufficient time to review it.").

Fourth, prior to the pending motion, Mr. Dumont made no attempt to revoke the Release or return the $7,000 supplemental consideration he accepted. Having received the benefits of his contractual agreement, he should not now be permitted to reject its burdens. *See United States v. Bank of N.Y.*, 14 F.3d 756, 759 (2d Cir. 1994) ("When a party makes a deliberate, strategic choice to settle, she cannot be relieved of such a choice merely because her assessment of the consequences was incorrect.").

Finally, the Release is only two pages long and clearly advises Mr. Dumont of the rights he is waiving, and conspicuously informs him of his right to consult with an attorney before signing the Release. These facts weigh heavily in favor of finding the Release valid. *See Pampillonia v. RJR Nabisco, Inc.*, 138 F.3d 459, 463 (2d Cir. 1998) (concluding plaintiff knowingly and voluntarily entered into release where, among other facts, the release "advised plaintiff to seek legal advice"); *Dewey*, 1996 WL 364531, at *3 (noting that "although [plaintiff] did not consult an attorney prior to signing the release, there is nothing to indicate that she did not have the opportunity to do so.").

Considering the totality of the circumstances, the court concludes that, as a matter of law, Mr. Dumont knowingly and voluntarily executed the Release. The undisputed facts support no other rational conclusion. *See Scott v. Harris*, 550 U.S. 372,

9

378 (2007) (denying motion for summary judgment where a rational juror could decide in favor of the non-moving party under the applicable law); *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 51 (2d Cir. 1993) ("There is no material fact issue only when reasonable minds cannot differ as to the import of the evidence before the court.").

### D. Whether the Release Violates Public Policy.

As a final challenge, Mr. Dumont argues the Release is invalid because Ascent violated public policy by firing him for refusing to violate VOSHA and OSHA provisions and company policies. In response, Ascent correctly points out that even in those allegations are deemed to be true, releases often extinguish claims that allege violations of laws, regulations, and public policy. Indeed, the logical inference of Mr. Dumont's argument is that such claims could never be released even if the party asserting such claims wished to do so.

"It has long been established in Vermont that 'contracts [are] not illegal and void as being against public policy unless it could be said that they [are] injurious to the interests of the public or contravene[] some established interest of society.'" *Maska U.S., Inc. v. Kansa Gen. Ins. Co.*, 198 F.3d 74, 80 (2d Cir. 1999) (quoting *State v. Barnett*, 3 A.2d 521, 526 (Vt. 1939)). Accordingly, the party seeking to avoid the consequences of a release must show that to enforce it would to be "cruel or shocking to the average man's conception of justice . . . or injurious to the public or against the public good." *Dutch Hill Inn, Inc. v. Patten*, 303 A.2d 811, 814 (Vt. 1973) (internal citations and quotation marks omitted). It is not enough to assert that the released claims are based upon acts that themselves violate public policy. *See, e.g., Phillips v. Moore*, 164 F. Supp. 2d 1245, 1253 (D. Kan. 2001) (finding "the release executed by plaintiff bars his Title VII sexual harassment claim"); *Lambertson v. Kerry Ingredients, Inc.*, 50 F. Supp. 2d 163, 170 (E.D.N.Y. 1999) (stating "because the terms of the General Release expressly bar this type of employment discrimination claim, the Court grants the defendant's motion for judgment on the pleadings dismissing the complaint.").

10

In this case, Mr. Dumont voluntarily waived his future rights to assert any claims he may have arising out of his employment with Ascent, including claims that his termination somehow frustrated the public policies underpinning VOSHA and OSHA. There is no evidence to support a conclusion that enforcement of the Release would be cruel or shocking to the average man's conception of justice, injurious to the public, or against the public good. In the absence of such proof, the Release must be enforced in accordance with its terms.

## CONCLUSION

For the reasons set forth above, Ascent's motion for summary judgment with regard to Mr. Dumont's counterclaims (Doc. 43) is GRANTED.
SO ORDERED.

Dated at Rutland, in the District of Vermont, this 7th day of May, 2012.

Christina Reiss, Chief Judge
United States District Court